UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOSHUA FRANCIS,                                    CIVIL DIVISION

            Plaintiff,                             Case No.   2:21-cv-358

      v.

GR ENERGY SERVICES,

            Defendant.

**COMPLAINT AND JURY DEMAND**

A.    ***Preliminary Statement***

1.    The plaintiff Joshua Francis brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* to redress violations of his right to be free from employment discrimination, harassment and retaliation based upon his race.   Because of the violations described herein, this Court is also empowered to exercise pendent jurisdiction pursuant to the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.*   A jury trial is demanded.

B.    ***Jurisdiction***

2.    The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 2000e *et seq.*, 28 U.S.C. § 1331 and under the doctrine of pendent jurisdiction.

3.    On or about November 9, 2020, the plaintiff filed a timely charge alleging discrimination with the Equal Employment Opportunity Commission ("EEOC"), docketed at 533-2021-00266.   This charge was simultaneously cross-filed with the Pennsylvania Human Relations Commission.

4.    The EEOC issued a Notice of Right to Sue dated February 9, 2021.

5.    This Complaint is filed within 90 days of receipt by the plaintiff of the Notice of Right to Sue.

C.    *__The parties__*

6.    The plaintiff is an adult individual who resides at 1424 Canton Avenue, Morgantown, WV 26505.

7.    The defendant GR Energy Services ("GRES" or "the company") is an entity doing business in the Commonwealth of Pennsylvania.  At all times material, the defendant had a place of business located at within this district, specifically 2315 PA-66, Delmont, PA 15626 (Westmoreland County).

8.    The defendant is a well completion and production solutions company that provides equipment and services to companies that are drilling oil and gas wells.

9.    At all times material, the defendant employed more than fifteen employees.

10.    The defendant was the plaintiff's employer and is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(b).

D.    *__Factual Background__*

11.    The plaintiff was employed by GRES from May 2, 2019 through May 13, 2020.

12.    The plaintiff was employed as a wireline operator. As a wireline operator, his responsibilities included building the explosive tools that are used in the process of fracking.

13.    The plaintiff performed all of the functions of his job in a competent fashion and was a good worker.

14.    While he was an employee, the plaintiff was subjected to discriminatory comments and treatment by his co-workers and managers on account of his race (African American), retaliated against for raising complaints and issues to management and human

2

resources regarding discriminatory treatment, treated differently than similarly situated white employees and his termination was a result of discriminatory animus.

15.     GRES' workforce was primarily white; the plaintiff was one of very few African American employees.

16.     Shortly after he started his employment with the company, the plaintiff was in the field with other employees. The plaintiff was in a truck with a couple of other workers driving on a road at night.  A vehicle was driving in the opposing lane with the high beams on.  One of the employees yelled, "Hey, turn your lights down, nigger!"  The employee realized the plaintiff was in the truck and apologized for using the "N-word".  He also said, "I'm sorry, but I got to let you know that you're going to be hearing that a lot around here."

17.     In approximately August 2019, the plaintiff was on a pad with his crew.  Someone had brought a football and the workers were tossing it around during a period of downtime.   The plaintiff threw the football and it hit the windshield of a vehicle belonging to a safety representative from another contractor.  As a result of this incident, the crew was reprimanded and kicked off the pad.  Per company policy, this type of reprimand called for the employees to be assigned to the shop for a period of two weeks and then taken off the schedule for another week.  Pay associated with working at the shop is significantly lower than working in the field, so this discipline incurred a loss of pay.

18.     The white crewmembers spent their two weeks at the shop (and did their "time off work" for a week) and were subsequently sent back into the field.  The plaintiff, however, was treated differently than the white crewmembers; he was not sent back into the field; he spent the next five months working in the shop.

19.     During his time at the shop, white co-workers often spoke about issues relating to black culture with or in front of the plaintiff, often in disparaging ways.  For example, co-workers occasionally asked the plaintiff, "How come ya'll can say the N-word, but I can't?"  On another occasion, a co-worker asked about the plaintiff's political stance, asking him if he was a Democrat.  The plaintiff responded that he was an Independent.  The co-worker rolled his eyes and smirked, saying, "yeah, right", insinuating that, since the plaintiff is black, he must be a Democrat.

20.     Although employees at the shop were supposed to clock in at 8:00 am each morning, the rule was not enforced.  If an employee clocked in around 8:20 am or a little later, it was called a "soft 8" and no discipline was issued, even if the employee did it on a consistent basis.  This "soft 8" policy was not applied to the plaintiff.  The plaintiff was written up two times for his "soft 8's" even through similarly situated white employees were not disciplined for the same conduct. After his second write-up, the plaintiff realized that, if he got written up for another "soft 8" he would be subject to termination.  The plaintiff realized that the company's management was looking for a way to terminate his employment.

21.     In January 2020, the plaintiff was finally given assignments to work in the field.

22.     The plaintiff was again assigned to an all-white crew.  The other crewmembers rarely spoke to the plaintiff or acknowledged him.  However, they were friendly with each other.

23.     Tim Boshert (Caucasian) was a lead supervisor.  He gave the plaintiff a difficult time.  He would bait the plaintiff into discussing social issues and when the plaintiff gave his opinions on certain topics, Boshert would say, "Oh there you go again with your Black Panther bullshit".

4

24.     Boshert also subjected the plaintiff to heightened scrutiny than similarly situated white employees, including making him perform job tasks from start to finish in his presence. While the plaintiff was performing the task, Boshert acted like the plaintiff had no knowledge about what he was doing and made sharp and demeaning comments.  He wouldn't give the plaintiff any credit; instead he said that the plaintiff should have done the task faster.

25.     In mid-January 2020, the plaintiff forgot to fill the setting tool oil jug prior to the shift change.  He hadn't had to do these tasks for several months since he was in the shop and forgot that this job had to be done.  The other crewmembers (all white) knew that the plaintiff had not filled the setting oil jug but did not bother to alert him to the oversight.

26.     There was a whiteboard in the gun trailer which had the task assignments broken down by crewmember.  The next day, the plaintiff saw that someone had written FILL UP SETTING TOOL OIL on his section of the board.  Underneath that was a drawing of someone giving a penis oral sex.  The plaintiff erased the drawing off of the board, figuring that it was just typical "oil field drama" nonsense.

27.     A couple of days later, the plaintiff again forgot to fill the setting tool oil jug before the end of the shift.  Again, none of the other crewmembers reminded the plaintiff to do so.  Steve Listovich, the lead supervisor (Caucasian) was upset with plaintiff and gave the plaintiff a hard time over this inadvertent oversight.  Listovich walked towards the plaintiff yelling and screaming in full sight of the other crewmembers:  Josh!  Get back down there and fill up the setting tool oil.  I even wrote it for you on the damn board!"  The plaintiff asked Listovich to stop yelling at him and be a little more respectful.  Listovich scoffed and said, "If you don't do as I say, you'll get kicked off this location!"

28.     The next day, Josh Wilson, lead supervisor, wrote on the board – directed at the plaintiff: "DO YOUR FUCKING JOB".

29.     The plaintiff took a picture of the board and sent a copy to the front office complaining about the fact that he was being harassed.  The front office sent three people to find out what was going on, Matthew Cooney, Matthew Scott and Tom Lob.  Matthew Scott told the plaintiff that there was nothing that he could do and suggested that the plaintiff fight the offenders after work some day. Matthew Cooney was the only one who seemed to be talking to the crewmembers and telling them to stop the behavior.  The crewmembers were agitated about being "talked to" by Cooney and were complaining that the plaintiff "shouldn't have gone to the front office".

30.     After Cooney left, Tim Boshert, lead supervisor, was visibly upset by what had happened.  He told the plaintiff, "Are you gonna run to the front office every time we make you feel uncomfortable out here?  I thought you was a country nigga!"

31.     Shortly after this incident, Josh Prayear (African American) approached the plaintiff in an attempt to mediate the situation.  The plaintiff told Prayear about being called racial epithets and the disparate treatment to which he was being subjected.  Prayear sympathized with the plaintiff and told him that being treated differently because of his race just came with the territory when working for this company.  He advised the plaintiff not to report that to the front office and to let it go.

32.     Initially, the plaintiff held off.  He was off for a week and felt more and more anxious about having to go back to work to that hostile environment.  He decided to ignore Prayear's "advice" and in February 2020, he called Cooney and told him that Boshert was mad

6

that the plaintiff had called the front office and that he had called him the N-word after Cooney had left the site.  Cooney told the plaintiff to "drop it" and to not tell anyone.

33.     The plaintiff did not feel that it was right to "sweep this under the rug", so he communicated with Human Resources and raised issues about the discriminatory treatment to which he was being subjected.

34.     On approximately February 11, 2020, the plaintiff was on the road heading to a pad in Ohio.  He had been instructed to report to the pad instead of the yard by a Tom Lob.  The plaintiff texted Chris Lingren, in the front office advising him that he had reported race discrimination/harassment issues to HR.  Cooney called the plaintiff shortly thereafter and asked the plaintiff why his name had been brought up with HR.  Cooney was upset by this.  The plaintiff then received a message from Lob telling him that he couldn't work at the Ohio pad because there was already one other Green Hat working there.  The plaintiff was also still a Green Hat.  Lob told him that company rules prohibited two Green Hats from working on a pad at the same time.

35.     Over the ensuing months, the plaintiff repeatedly went to human resources about how he was being treated and to find out if anything was being done.  Although he was repeatedly told that HR was "looking into the situation", nothing changed and, in fact, the harassment and disparate treatment continued and got worse.

36.     The plaintiff was eligible for promotion to a White Hat, but was turned down.  He was told that he had to have a CDL license to be eligible for White Hat.  Similarly situated white employees were promoted to White Hat without having a CDL license.

37.     After complaining to HR, the plaintiff was regularly assigned to work with Listovich.  The plaintiff complained to HR about this because he did not feel safe working with

Listovich.   For example, Listovich regularly brandished a knife in front to the plaintiff.   HR never responded.

38.     Later in February, one of the plaintiff's tires were slashed.

39.     In March 2020, crewmembers hid the plaintiff's work clothing before the shift began.  The plaintiff was able to find another set of work clothing that he was able to fit into.  If he had attempted to clock in without having the proper clothing, he would have been subject to discipline.  Since he already had two warnings, further discipline would have subjected him to termination.

40.     On May 13, 2020, the plaintiff was advised that he was being laid off due to lack of work.

41.     The reason given for the plaintiff's termination was nothing more than a pretext and the real reason that he was fired was because of his race.   Further, the plaintiff was terminated in retaliation for raising the issue of his discriminatory treatment with HR.

**FIRST CAUSE OF ACTION**

42.     The preceding paragraphs are incorporated herein by reference as if they were set forth at length.

43.     The plaintiff is African American and thus is protected against discrimination, harassment and retaliation on the basis of his race pursuant to Title VII.

44.     The plaintiff was qualified for his position.

45.     Despite his qualifications, the plaintiff was terminated.  The reasons given for his discharge were a pretext.

46.     The defendant's discharge of the plaintiff was because of his race in violation of Title VII.

8

47.     Further, the defendant created, fostered and maintained a hostile work environment based on the plaintiff's race.

48.     The defendant failed and refused to take action when the plaintiff went to management and complained about the hostile work environment and the discriminatory treatment to which he was subjected.

49.     The defendant retaliated against the plaintiff for raising these issues.

50.     The defendant's violation of Title VII was committed with intentional or reckless disregard for the plaintiff's federally protected right to work in an environment free of race discrimination.

## SECOND CAUSE OF ACTION

51.     The preceding paragraphs are incorporated herein by reference as if they were fully set forth herein.

52.     As a direct and proximate cause of its actions, detailed above, the defendant has violated the plaintiff's right to be free from discrimination and harassment under the Pennsylvania Human Relations Act, 43 Pa. C.S.A. § 951 *et seq.*

WHEREFORE, the plaintiff respectfully requests judgment be entered in his favor and against the defendant and that the defendant be required to provide all appropriate remedies under Title VII and the PHRA, including attorney's fees and costs.

Respectfully submitted,

*/s/ Michael J. Bruzzese*

Michael J. Bruzzese
Pa. I.D. No. 63306
2315 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
(412) 281-8676
Counsel for the plaintiff

Dated: March 17, 2021